IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 32374-9-III |
| | ) | |
| Respondent, | ) | |
| | ) | UNPUBLISHED OPINION |
| v. | ) | |
| | ) | |
| ANDRE JACOB NUNEZ, | ) | |
| | ) | |
| Appellant. | ) | |

PENNELL, J. — Andre Nunez appeals his conviction for first degree assault with a gang-aggravating sentence enhancement. While some of the errors raised have substantial merit, none warrant reversal. We therefore affirm.

## FACTS[1]

Brothers Ricardo and Ramiro Ruiz[2] worked at Washington Beef in Yakima. Ricardo, a former Sureños gang member,[3] worked alongside Mr. Nunez for a short time.

---

[1] The following statement is taken from the facts presented at trial, construed in the light most favorable to the State as prevailing party.

[2] For clarity, we reference the Ruiz brothers by their first names. No disrespect is intended.

[3] Ricardo was actually a member of a Sureños gang in California. He moved to Washington an in attempt to leave the gang lifestyle.

While at work one day, Ramiro accidentally bumped into Mr. Nunez. After Ramiro apologized, Mr. Nunez called him a "scrap," a derogatory word for a Sureño gang member, even though Ramiro was not a gang member. 7 Report of Proceedings (RP) (Feb. 10, 2014) at 692. In previous interactions, Mr. Nunez had called the brothers "scraps," said "Norte," a word used by Norteños gang members, and bragged "he never been dropped by Sureños." 6 RP (Feb. 7, 2014) at 659, 661.

Later that same day, while Ricardo and Mr. Nunez were on a break, Mr. Nunez told Ricardo that Ramiro "better watch his back" as Mr. Nunez threatened to "pull his card." *Id.* at 649-50. Ricardo told Mr. Nunez he should go through him instead of his brother because it was he, not Ramiro, who was a gang member. Mr. Nunez replied he was a "Yakima banger for LR," or La Raza, a subset of the Norteños. *Id.* at 654. A short while later, Ramiro entered the break room. Ricardo told Ramiro about this conversation but indicated he would handle it. As Ramiro went to leave, Mr. Nunez attempted to engage him, asking Ramiro to go to the restroom with him. A fight then ensued. During the fight, Mr. Nunez picked up a chair, showed his red belt, and made a sign referring to La Raza. Ricardo tackled Mr. Nunez, knocking him out after Mr. Nunez's head hit the wall. When Mr. Nunez got up, he yelled "gang stuff to [Ricardo] . . . like '[f]ucking scraps.'" 7 RP (Feb. 10, 2014) at 697. Following this altercation, Ricardo and Ramiro

2

were fired.

Five weeks after the fight at Washington Beef, Ramiro stopped in an empty Park and Ride lot near Yakima. A car pulled up behind him. Ramiro was sitting in the driver's seat of his car when someone threw a water bottle at him through his open rear window. Ramiro then saw Mr. Nunez jump into his car through the open window. Mr. Nunez stabbed Ramiro in the chest with a small knife. Mr. Nunez kept trying to stab Ramiro, at one point making his way into the front passenger part of the car. As he tried to stab Ramiro, Mr. Nunez said, "'[w]ell now you fucking scrap. What are you going to do now?'" *Id.* at 703. Ramiro was able to jump from the car, and Mr. Nunez followed him, continuing to call him a "'fucking scrap.'" *Id.* at 702. Mr. Nunez then said, "'[i]t's all about Norte. What the fuck are you going to do you fucking scrap?'" *Id.* at 704. After saying this, Mr. Nunez chased Ramiro around the car, demanding Ramiro give him his wallet. As Ramiro ran, he saw a female sitting in the driver's side of the car parked behind him. Ramiro flagged down help from another driver, and Mr. Nunez left in the car driven by the female. Ramiro went to the hospital, where he received six or seven sutures to close his wound.

## PROCEDURAL HISTORY

Mr. Nunez was arrested for second degree assault based on the Park and Ride

3

incident. When he was booked into jail, he was housed in an area where inmates affiliated with the Norteños resided. A few days later, Officer Steven Winmill checked in with Mr. Nunez regarding his housing status. Without first reading Mr. Nunez his *Miranda*[4] rights, Officer Winmill asked Mr. Nunez questions from the jail's classification interview form to determine if he was correctly housed. Mr. Nunez told Officer Winmill he was affiliated with the Norteños.

Two months later, the State amended Mr. Nunez's charges to include one count of first degree assault with a gang aggravator.[5] Prior to trial, the parties litigated the admissibility of gang evidence, including the statements about gang affiliation Mr. Nunez made to Officer Winmill, Mr. Nunez's tattoos, and testimony of a gang expert.

At trial, the State called Officer Chris Taylor as a gang expert. Officer Taylor testified about the rivalry between the Norteños and Sureños; the tattoos and symbols worn by Norteños; the meaning behind the word "scrap," a term the Norteños use to call their rivals; and how the Norteños retaliate when disrespected.

The State also called Jessenia Acevedo Nunez, the female who was in the car during the altercation at the Park and Ride. At the time of the incident, she was Mr.

---

[4] *Miranda v. Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[5] Mr. Nunez was also charged with one count of attempted first degree robbery with a gang aggravator. He was found not guilty on this count.

4

Nunez's fiancé. The two married subsequent to the filing of formal charges against Mr.

Nunez. Mrs. Nunez testified despite Mr. Nunez's assertion of testimonial privilege. The

State also played recordings of jail phone calls between Mr. and Mrs. Nunez.

Mr. Nunez was convicted of first degree assault. By special verdict, the jury found

Mr. Nunez was armed with a deadly weapon and he committed the crime with intent to

cause benefit to a criminal street gang. Mr. Nunez appeals his conviction.

## ANALYSIS

*Booking Questions*

Mr. Nunez argues the trial court erred when it admitted his custodial statements to

Officer Winmill about gang affiliation. Mr. Nunez's argument is that because questions

about gang evidence are likely to elicit an incriminating response, particularly in the

context of an assault charge, he should have been read his *Miranda* rights. Mr. Nunez has

not raised a separate claim regarding whether or not his statements were involuntary.[6]

*Miranda* warnings are required prior to custodial interrogations. *Miranda v.*

*Arizona*, 384 U.S. 436, 444, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). There is no dispute

---

[6] We therefore do not analyze whether the nature of Officer Winmill's questioning sufficiently differed from the process analyzed in *State v. Juarez DeLeon*, 185 Wn.2d 478, __ P.3d __ (2016), to render Mr. Nunez's statements involuntary apart from the *Miranda* violation.

Officer Winmill did not give Mr. Nunez his *Miranda* warnings. It is also undisputed Mr. Nunez was in custody. The issue is whether Officer Winmill's questions amounted to interrogation or whether they were merely routine booking questions, unlikely to elicit an incriminatory response.

*Miranda* warnings are required "whenever a person in custody is subjected to either express questioning or its functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 300-01, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980). Questions asked during a routine booking process are typically not interrogation. *State v. Denney*, 152 Wn. App. 665, 671, 218 P.3d 633 (2009), *overruled on other grounds by In re Cross*, 180 Wn.2d 664, 681 n.8, 327 P.3d 660 (2014). This is not because the booking context itself is exempt from scrutiny. It is because questions asked during booking—such as name, address, age—are typically innocuous. But this is not always true. Booking questions can constitute interrogation if they were "reasonably likely to elicit an incriminating response." *Id*. This is an objective test and the court's focus is on the perceptions of the suspect. *Innis*, 446 U.S. at 301.

As we recognized in *State v. Juarez DeLeon*, 185 Wn. App. 171, 198-203, 341 P.3d 315 (2014), *reversed on other grounds by* 185 Wn.2d 478, __ P.3d __ (2016), questions relating to gang membership are not innocuous. Gang evidence can be used to

enhance a defendant's sentence. RCW 9.94A.535(3)(aa). It can also be used as proof of intent, motive, or the existence of a criminal conspiracy. ER 404(b); *State v. Yarbrough*, 151 Wn. App. 66, 81, 210 P.3d 1029 (2009). Asking an individual charged with a violent crime about whether he is a gang member is not like asking about membership in a social or civic club. As explained by the State's own expert, Officer Chris Taylor, groups such as the Norteños and Sureños are criminal street gangs whose members have a long history of retaliatory acts of violence. Both our court and the Supreme Court have recognized that statements made about gang affiliation during jail classification procedures are usually, if not always, involuntary. *Juarez DeLeon*, 185 Wn.2d at 486-87. To the extent it might be possible for the voluntariness test to be overcome in some instances, *Miranda* warnings must be provided prior to the admission of a defendant's statements in the State's case in chief.

Because Officer Winmill's questions to Mr. Nunez about gang affiliation were likely to elicit an incriminating response, they should have been suppressed. Nevertheless, the admission of this evidence was harmless. Unlike in *Juarez DeLeon*, the State presented overwhelming evidence of Mr. Nunez's gang affiliation at trial. *See id.* at 487-89. Mr. Nunez's body was covered with gang-related tattoos, his wife confirmed he was a member of the Norteños, and testimony by the Ruiz brothers indicated Mr. Nunez

7

made repeated gang-related statements and wore gang-related colors. Given these circumstances, the *Miranda* violation does not warrant reversal.

*Spousal Privilege*

Mr. Nunez's wife was compelled to testify at trial over objection. Whether this was lawful turns on our interpretation of RCW 5.60.060(1), the statute governing spousal privilege. RCW 5.60.060(1) provides:

> A spouse or domestic partner shall not be examined for or against his or her spouse or domestic partner, without the consent of the spouse or domestic partner; nor can either during marriage or during the domestic partnership or afterward, be without the consent of the other, examined as to any communication made by one to the other during the marriage or the domestic partnership. *But this exception shall not apply* to a civil action or proceeding by one against the other, nor to a criminal action or proceeding for a crime committed by one against the other, *nor to a criminal action or proceeding against a spouse or domestic partner if the marriage or the domestic partnership occurred subsequent to the filing of formal charges against the defendant*, nor to a criminal action or proceeding for a crime committed by said spouse or domestic partner against any child of whom said spouse or domestic partner is the parent or guardian, nor to a proceeding under chapter 70.96A, 70.96B, 71.05, or 71.09 RCW: PROVIDED, That the spouse or the domestic partner of a person sought to be detained under chapter 70.96A, 70.96B, 71.05, or 71.09 RCW may not be compelled to testify and shall be so informed by the court prior to being called as a witness.

(Emphasis added.) Because Mr. Nunez and his wife were married after the State filed criminal charges, the State successfully argued to the trial court that the above-italicized portion of RCW 5.60.060(1) permitted compelling Mrs. Nunez's testimony.

8

Although not identified as such by the legislature, RCW 5.60.060(1) covers two types of spousal privilege: (1) the testimonial privilege, which prevents a spouse from testifying against the other spouse without the other spouse's consent, and (2) the confidential communications privilege, which prevents a spouse from being examined as to confidential communications made during the marriage. *State v. Thornton*, 119 Wn.2d 578, 580, 835 P.2d 216 (1992); *State v. Thorne*, 43 Wn.2d 47, 55, 260 P.2d 331 (1953).

Resolution of the current issue turns on whether the restrictions on spousal privilege outlined in RCW 5.60.060(1) apply to both types of privilege or just the latter. This is a matter of statutory interpretation, which we review de novo. *State v. Evans*, 177 Wn.2d 186, 191, 298 P.3d 724 (2013). In construing a statute, the court's fundamental objective is to ascertain and carry out the legislature's intent. *Lake v. Woodcreek Homeowners Ass'n*, 169 Wn.2d 516, 526, 243 P.3d 1283 (2010).

Common sense plays an important role in statutory interpretation. "[W]e presume the legislature does not intend absurd results and, where possible, interpret ambiguous language to avoid such absurdity." *State v. Ervin*, 169 Wn.2d 815, 823-24, 239 P.3d 354 (2010). Under Mr. Nunez's approach, all the restrictive clauses contained in RCW 5.60.060(1) would apply only to confidential spousal communications. This construction would render the listed exceptions virtually ineffective. For example, a spouse alleging

9

physical abuse against herself or a child could be kept off the stand by her husband unless she first obtained a divorce. However, during divorce proceedings the same spouse could also be barred from providing testimony. In the current context, the restriction on privilege would only apply to the unique situation of spouses who marry after the State initiates charges, then engage in pertinent confidential communications, and then divorce prior to trial. We cannot envision the legislature intended either result. For RCW 5.60.060(1)'s restrictions to have real effect, they must apply equally to both forms of spousal privilege.

Case law and commentary confirm our interpretation. In *Thornton*, the Supreme Court analyzed the defendant's testimonial spousal privilege claim against RCW 5.60.060(1)'s restriction for spousal crime victims. The court held the restriction applied and the defendant could not prohibit his wife from testifying. *Thornton*, 119 Wn.2d at 580. While the question before the court was distinct from the one here, *Thornton*'s outcome would have been different had the statute's limiting clauses only applied to confidential communications. Consistent with this result, Karl Tegland's treatise on evidence provides simply that "[t]he restrictions and exceptions to the rule of incompetency are the same as the restrictions and exceptions to the privilege for confidential communications between husband and wife." 5A KARL B. TEGLAND,

10

No. 32374-9-III
*State v. Nunez*

WASHINGTON PRACTICE: EVIDENCE § 501.43 & n.1, at 213 (5th ed. 2007).

The restrictive clauses set forth at RCW 5.60.060(1) undoubtedly apply to both forms of spousal privilege. Because Mr. Nunez and his wife were married after the State initiated charges, the State could compel Mrs. Nunez's testimony over objection.

*Authentication of Jail Phone Calls*

Mr. Nunez claims the trial court erred in admitting the recorded jail phone calls without proper authentication. Because no objection was raised in the trial court, this issue has been waived. *State v. Roberts*, 73 Wn. App. 141, 145, 867 P.2d 697 (1994).

*Admissibility of Gang Evidence*

Numerous challenges are made to the trial court's admission of gang evidence, including whether: (1) there was a sufficient nexus between the gang evidence and the crimes charged, (2) gang evidence was properly admitted under ER 404(b) and ER 403, (3) the admission of gang evidence violated Mr. Nunez's rights to be presumed innocent and to freedom of association, (4) gang evidence was admitted in violation of Mr. Nunez's confrontation rights, and (5) Officer Taylor, the State's gang expert, improperly opined that Mr. Nunez's motivation for assaulting Ramiro was to benefit the Norteños.

This court reviews a trial court's evidentiary rulings for abuse of discretion. *State v. Asaeli*, 150 Wn. App. 543, 573, 208 P.3d 1136 (2009). Mr. Nunez bears the burden of

11

No. 32374-9-III
*State v. Nunez*

proving the trial court abused its discretion. *Id.*

*Nexus*

Mr. Nunez argues there was an insufficient nexus between the gang evidence and the crime charged. We disagree. The State presented ample evidence of nexus, including testimony that Mr. Nunez uttered gang slurs and boasts during both the initial fight at Washington Beef and the subsequent altercation at the Park and Ride. This was sufficient. *See State v. Campbell*, 78 Wn. App. 813, 822, 901 P.2d 1050 (1995). Mr. Nunez's claim that the gang-related statements attributed to him were not credible went to weight, not admissibility. The State was entitled to prove its case. Gang evidence was central to the case and was properly admitted.

*Character evidence*

Mr. Nunez also argues the gang evidence should have been excluded under ER 404(b), which prohibits the introduction of bad character evidence. While recognizing gang evidence can sometimes be relevant for a noncharacter purpose, such as motive, plan, or identity, Mr. Nunez claims the trial court abused its discretion in admitting gang evidence because there was no factual basis for concluding his offense was gang related.

Mr. Nunez's argument fails for reasons similar to those raised in the nexus context. Under the State's theory, Mr. Nunez's crime was gang related. Although Ramiro Ruiz

12

was not gang affiliated, his brother Ricardo was. The State's theory was that Mr. Nunez assaulted Ramiro at the Park and Ride in retaliation for the previous fight with Ricardo at Washington Beef. In addition, because Mr. Nunez questioned the credibility of the Ruiz brothers' statements that Mr. Nunez made gang-related slurs, the State was entitled to introduce corroborating evidence. This broadened the scope of the permissible gang evidence at trial.[7] Prior to admitting the gang evidence, the trial court weighed the probative value of the evidence against its prejudicial effect. The court even excluded some of the State's proposed gang evidence as too prejudicial. There was no abuse of discretion.[8]

*Constitutional rights*

Because gang evidence was properly admitted under ER 404(b), Mr. Nunez's constitutional objections to admission fail. *Dawson v. Delaware*, 503 U.S. 159, 165, 112 S. Ct. 1093, 117 L. Ed. 2d 309 (1992) (only when evidence of gang membership proves no more than a defendant's abstract beliefs does its admission violate a defendant's

---

[7] The trial court also indicated the gang evidence was admissible to prove identity. Because identity was not at issue, this basis for admission was erroneous. However, because the evidence was properly admitted to show intent and motive, there is no error.

[8] We do note some of Officer Taylor's expert testimony may have been excessive; however, it was not prejudicially so given the very strong evidence that Mr. Nunez's offense was gang related. *See Juarez DeLeon*, 185 Wn.2d at 489-91 (urging trial courts use caution when considering generalized gang evidence).

constitutional right of freedom of association).

*Confrontation clause*

Mr. Nunez contends the trial court erred by admitting exhibit 30, which he claimed included testimonial hearsay. As no objection was raised in that forum, this issue has been waived. *State v. O'Cain*, 169 Wn. App. 228, 240, 252, 279 P.3d 926 (2012).

*Improper opinion testimony*

Mr. Nunez argues Officer Taylor improperly opined on the evidence by testifying that Mr. Nunez was motivated to assault Ramiro in order to benefit the Norteños. Because this line of testimony was elicited by defense counsel, it is invited error. We therefore decline review.

*Sufficiency of Evidence for Gang Aggravator*

Apart from his arguments regarding the admissibility of gang evidence, Mr. Nunez argues the State presented insufficient evidence to support the gang-aggravating sentence enhancement. As discussed above, the trial record contains ample evidence that Mr. Nunez assaulted Ramiro Ruiz in order to benefit or aggrandize the Norteños street gang. This provided the jury a sufficient basis for finding aggravating circumstances under RCW 9.94A.535(3)(aa). We will not disturb the verdict.

No. 32374-9-III
*State v. Nunez*

*NonGang Bad Act Evidence*

In addition to his objections to gang evidence under ER 404(b), Mr. Nunez also argues the trial court improperly admitted testimony from Mrs. Nunez indicating she had seen him fight before and the jail phone call where he referred to his mother in a derogatory manner. We find any error in admission harmless. The testimony regarding other fights was both brief and vague. The focus of the recorded jail call was on Mr. Nunez's admissions of wrongdoing, not his statements about his mother. Neither claimed error is sufficient to overturn the jury's verdict.

*Jury Instructions*

Mr. Nunez argues the trial court erroneously instructed the jury on a less egregious level of harm that thereby relieved the State of its burden to prove each element of first degree assault beyond a reasonable doubt. Although no objection was raised in the trial court, this is the type of constitutional error that may be raised for the first time on appeal. *State v. Roggenkamp*, 153 Wn.2d 614, 620, 106 P.3d 196 (2005).

The instruction at issue read as follows:

> Great bodily harm means bodily injury that creates a probability of death, or which causes significant serious permanent disfigurement, or that causes a significant permanent loss or impairment of the function of any bodily part or organ.
> Bodily injury means physical pain or injury, illness, or an impairment of physical condition.

15

Clerk's Papers (CP) at 253. Mr. Nunez takes issue with the inclusion of the definition of "bodily injury."

Because the instructions included definitions of both "great bodily harm" and "bodily injury," Mr. Nunez argues the instructions permitted the jury to find him guilty based on an insufficient degree of harm. Assault in the first degree requires the State to prove intent to inflict "great bodily harm," not just bodily injury. RCW 9A.36.011. What Mr. Nunez fails to recognize is that the jury was instructed first degree assault required proof that Mr. Nunez acted "with intent to inflict great bodily harm." CP at 255. The definitional instruction simply explained the meaning of great bodily harm and did not lower the State's burden of proof.

*Prosecutorial Misconduct*

Several claims are made regarding alleged prosecutorial misconduct during opening statement and summation. These include (1) improper use of a civil standard of proof to prove intent, (2) inappropriate name calling, (3) disparaging Mr. Nunez's trial counsel, and (4) making inflammatory arguments unsupported by facts.

Prosecutorial misconduct allegations are reviewed for abuse of discretion. *State v. Thorgerson*, 172 Wn.2d 438, 460, 258 P.3d 43 (2011). To succeed on a prosecutorial misconduct claim, "a defendant is required to show that in the context of the record and

all of the circumstances of the trial, the prosecutor's conduct was both improper and prejudicial." *In re Glasmann*, 175 Wn.2d 696, 704, 286 P.3d 673 (2012). In order to show prejudice, a defendant must show a substantial likelihood the misconduct affected the jury's verdict. *Id.* If the defendant fails to object at trial, the complained-of errors are waived unless he establishes the misconduct is "so flagrant and ill intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by an admonition to the jury." *State v. Russell*, 125 Wn.2d 24, 86, 882 P.2d 747 (1994).

### Burden of proof

The prosecutor used the phrase res ipsa loquitur[9] during summation to argue Mr. Nunez intended to cause great bodily harm when he stabbed Ramiro in the chest. Mr. Nunez claims the State utilized this phrase to suggest it need not prove intent. We disagree. The prosecutor's argument was simply that the jury could infer intent from Mr. Nunez's actions. This was appropriate. *State v. Bea*, 162 Wn. App. 570, 579, 254 P.3d 948 (2011).

---

[9] Res ipsa loquitur, a Latin phrase meaning "'the thing speaks for itself,'" is used in civil litigation. *Curtis v. Lein*, 169 Wn.2d 884, 889, 239 P.3d 1078 (2010) (quoting W. PAGE KEETON, PROSSER AND KEETON ON THE LAW OF TORTS § 39, at 243 (5th ed. 1984). The doctrine of res ipsa loquitur recognizes an accident may happen under circumstances that allow the occurrence itself to circumstantially establish a defendant's prima facie negligence without further direct proof. *Jackson v. Criminal Justice Training Comm'n*, 43 Wn. App. 827, 829, 720 P.2d 457 (1986).

*Name calling*

During opening, the prosecutor described Mr. Nunez as a "sociopath." 5 RP (Feb. 6, 2014) at 438. This comment was entirely inappropriate. However, defense counsel objected and the trial court instructed the jury to disregard the prosecutor's statement. This court presumes the jury follows the court's instructions. *State v. Anderson*, 153 Wn. App. 417, 428, 220 P.3d 1273 (2009). We will not reverse on this basis.

*Disparaging defense counsel*

Mr. Nunez next argues the prosecutor committed misconduct in rebuttal by (1) telling the jury defense counsel presented arguments that were "little rabbit trails," "red herrings," and "argument falsifies" and (2) comparing defense counsel to a fictional movie villain. 10 RP (Feb. 13, 2014) at 1183, 1185. Defense counsel did not object to these remarks.

It is a prosecutor's duty to use every legitimate means to bring about a just conviction. *Berger v. United States*, 295 U.S. 78, 88, 55 S. Ct. 629, 79 L. Ed. 1314 (1935). A prosecutor can and should act with both "earnestness and vigor." *Id.* Yet the prosecutor's role is also unique. The prosecutor is no ordinary advocate, but the State's representative in court. The prosecutor must endeavor to ensure justice for all persons, including opposing counsel and the criminally accused. Thus, while a prosecutor may

strike hard blows against the defense, he or she may not strike foul ones. *Id.* Statements

impugning or maligning defense counsel violate a prosecutor's ethnical code and will

sometimes require reversal. *State v. Lindsay*, 180 Wn.2d 423, 432, 326 P.3d 125 (2014).

Here, the tone of the prosecutor's argument was aggressive, and the use of the

phrase "argument falsifies" came close to an inappropriate allegation of deceptive

conduct by defense counsel. However, when viewed in context, it is apparent the thrust

of the prosecutor's argument was to point out that defense counsel's arguments did not

seriously undermine the State's theory of the case or the credibility of its witnesses.

Furthermore, the analogy to Keyser Söze, a fictional antagonist from the movie *The Usual

Suspects*,[10] was not directed at defense counsel. Instead, the prosecutor was stating the

way defense counsel described the events in question made it seem like Ramiro, the

victim, was some sort of criminal mastermind like Keyser Söze.

*Inflammatory arguments unsupported by facts*

Mr. Nunez argues the prosecutor committed misconduct by arguing as follows:

(1) "I'll submit to you that when [Mr. Nunez] stabbed [Ramiro] in the chest and then

continued to try to stab him in the chest he was looking for a kill shot. . . .[Mr. Nunez]

wanted to say to [Ramiro], 'It's all about Norte.' As he died."; (2) "Thank God it was not

---

[10] THE USUAL SUSPECTS (MGM Studios 1995).

a serious wound. Thank God this is not a murder trial. Right?"; and (3) while Ramiro

was "begging someone to call 911," Mr. Nunez was calling fellow Norteños to brag about

what he had done. 9 RP (Feb. 12, 2014) at 1137, 1150; 10 RP (Feb. 13, 2014) at 1188.

Mr. Nunez did not object to any of these remarks.

The prosecutor has wide latitude in drawing and expressing reasonable inferences

from the evidence. *State v. Millante*, 80 Wn. App. 237, 250, 908 P.2d 374 (1995). When

reviewing a prosecutor's summation for error, we must look at the context of the entire

case, including the evidence presented, defense counsel's arguments, and the court's

instructions. *Russell*, 125 Wn.2d at 85-86. A defendant's "failure to object to an

improper remark constitutes a waiver of error unless the remark is so flagrant and ill

intentioned that it causes an enduring and resulting prejudice that could not have been

neutralized by an admonition to the jury." *Id.* at 86.

Mr. Nunez has not satisfied the difficult burden of overcoming waiver. Our

review of the record indicates the prosecutor's remarks had at least some evidentiary

basis. The prosecutor was treading in dangerous waters when he made comments to the

effect, "[t]hank God this is not a murder trial." 10 RP (Feb. 13, 2014) at 1188. However,

the substance of this remark was fair, given the minor nature of the injuries ultimately

sustained by Ramiro Ruiz. Any improper appeals to God or religion could have been

20

No. 32374-9-III
*State v. Nunez*

addressed through a curative instruction. *See, e.g. Levingston v. State*, 651 S.W.2d 319,

322 (Tex. App. Dallas 1983).

*Ineffective Assistance of Counsel*

Lastly, Mr. Nunez contends his defense counsel was ineffective for failing to

object to bad acts evidence, eliciting improper opinion testimony from Officer Taylor, and

failing to object to all instances of alleged prosecutorial misconduct. He asserts that

without the improper propensity evidence, the improper gang evidence, the improper

guilty by association evidence, and the prosecutorial misconduct, there is a reasonable

probability he would have had a different result at trial.

The Sixth Amendment to the United States Constitution guarantees a criminal

defendant the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S.

668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To establish ineffective

assistance of counsel, a defendant must show:

> (1) defense counsel's representation was deficient, *i.e.*, it fell below an
> objective standard of reasonableness based on consideration of all the
> circumstances; and (2) defense counsel's deficient representation prejudiced
> the defendant, *i.e.*, there is a reasonable probability that, except for
> counsel's unprofessional errors, the result of the proceeding would have
> been different.

*State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995); *Strickland*, 466 U.S.

at 687. "A reasonable probability is a probability sufficient to undermine confidence in

21

No. 32374-9-III
*State v. Nunez*

the outcome." *Strickland*, 466 U.S. at 694. Washington courts strongly presume

counsel's representation was effective. *McFarland*, 127 Wn.2d at 335. Deficient

performance is not shown by matters relating to trial strategy or tactics, and courts are

hesitant to find ineffective assistance of counsel where those tactics are unsuccessful. *See*

*State v. Sardinia*, 42 Wn. App. 533, 542, 713 P.2d 122 (1986) (giving defense counsel

wide latitude in making tactical decisions).

*Failure to object to bad acts evidence*

Mr. Nunez's argument regarding this alleged deficient performance is unclear.

Defense counsel objected to all of the gang evidence, to his wife's testimony about

previously seeing him fight,[11] and to the jail phone calls on ER 404(b) grounds. As such,

it cannot be said that defense counsel's representation was deficient.

*Eliciting improper opinion testimony*

As discussed previously, defense counsel did invite error by eliciting Officer

Taylor's improper opinion. However, from the record before us this appears to have been

---

[11] As the State points out in its brief, Mr. Nunez's defense counsel's objection to his wife's propensity testimony was untimely in the sense that defense counsel did not object until the State asked Mrs. Nunez how many times she had seen her husband fight. At that point, defense counsel successfully objected on ER 404(b) grounds. However, at that time, defense counsel could have argued that Mrs. Nunez's previous comment be stricken. Not requesting a limiting instruction can be a legitimate trial tactic to avoid reemphasizing damaging evidence. *Yarbrough*, 151 Wn. App. at 90.

22

No. 32374-9-III
*State v. Nunez*

a legitimate trial tactic. Defense counsel was attempting to get Officer Taylor to state Mr. Nunez had not done any work for the Norteños. Had defense counsel been successful in eliciting this testimony, he would have stronger support for his argument the assault was not gang related.

*Failure to object to prosecutorial misconduct*

The majority of Mr. Nunez's claimed errors have not been demonstrated to be misconduct. Thus, trial counsel was not ineffective for failing to object. To the extent that the prosecutor may have been overly zealous at times, there has been no showing of prejudice.

## CONCLUSION

Based on the foregoing, we affirm the judgment and sentence of the trial court.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Pennell, J.

I CONCUR:

_____
Fearing, C.J.

23

No. 32374-9-III

LAWRENCE-BERREY, J. (concurring) — Convictions must always be based on proper evidence and argument. Judges enforce rules of evidence and argument because our system desires to punish only the guilty.

The line between proper zealous advocacy and improper overzealous advocacy is thin and sometimes meandering. Well-intentioned prosecutors can become overzealous by seeking to admit bad evidence and by making inappropriate arguments, with the laudable goal of making our communities safer.

Where trial error occurs but the evidence to sustain a conviction is compelling, we affirm by a harmless error analysis. But where trial error occurs and the evidence to sustain a conviction is not compelling, we reverse. This is how we assure that convictions are based only on proper evidence.

We encourage elected prosecutors to thoroughly train their deputy prosecutors so they do not cross this thin and potentially meandering line, and thus incur the expense of a second trial.

Although adherence to the rules of evidence and proper argument might cause a few to escape justice, these requirements distinguish our government from governments

that too often punish the innocent. Our system of justice is not perfect. But when it works properly, our system is unequaled.

Lawrence-Berrey, J.

2