Consequently, we reverse the sentence enhancement.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.

MORGAN and BRIDGEWATER, JJ., concur.

[No. 33230-9-I. Division One. December 29, 1995.]

THE STATE OF WASHINGTON, *Respondent*, v. ADLAI CHARLES MILLANTE, *Appellant*.

*Catherine L. Floit* of *Washington Appellate Defender Association*; and *Nielsen & Acosta*, for appellant.

*Norm Maleng, Prosecuting Attorney*, and *Robert T. Reischling, Deputy*, for respondent.

COLEMAN, J. — Adlai Charles Millante appeals his conviction for first degree murder. We find the evidence sufficient to support both alternative means of committing first degree murder with which Millante was charged. We further find that any error in admitting evidence of Millante's prior convictions under ER 609(a)(1) was harmless and that the prosecuting attorney's closing argument was not improper. Accordingly, we affirm.

On June 6, 1992, Cathleen Caruso was found stabbed to death by the side of a road near Marysville. Millante was identified as the last person to see Caruso alive. He was arrested and charged, by amended information, with one count of first degree murder, committed as follows:

> That the defendant, . . . while committing and attempting to commit the crime of Robbery in the Second Degree, and in the course of and in furtherance of said crime and in the immediate flight therefrom, and with premeditated intent to cause the death of another person, did cause the death of Cathleen Heye, also known as Cathy Caruso[.]

At trial, Millante admitted killing Caruso but argued that it had been in self-defense. The prosecution's theory of the case was that Millante had asked Caruso to meet him for a drug transaction, all the while intending to rob and kill her.

The State's witnesses testified as to the following events. On June 4, Millante visited the house where his sister Marcella lived to ask her whether he could conduct a drug transaction there later in the day. He directed another

resident of the house to unlock a couple of doors in the basement, including the garage door. That evening, Millante paged Caruso several times. Around 8 P.M., Caruso told the friend she was with that the caller could not wait and that she would have to go meet him.

Around nine o'clock that evening, Millante returned to his sister's house and asked everyone to leave for an hour. When Marcella returned, she noticed a pool of blood on the floor and bloody footprints leading from the basement bedroom to the garage. Millante called Marcella and asked her to clean up the mess. He later gave her approximately $100 and told her not to ask any questions. Around 10 P.M., Millante visited Luke Markishtum, the father of his fiancée, Debbie. Millante stated that he had been involved in a hassle and had "to do this person." He said that he needed to dispose of "it," which was in the car, adding, "no body, no evidence." Millante gave Markishtum part of a gold chain and a small gun that had belonged to Caruso, telling him to "pitch" them.

The next day, Millante gave Markishtum cash to pay for a car that cost $8,000, which Millante wanted to buy but have registered in Markishtum's name. The day after that, Millante married Debbie, and they sold her car to a friend. They asked their friend to say that she bought the car on June 2. The carpet had been removed from the car's hatchback area.

Caruso's body was found two days after her meeting with Millante. Dr. Eric Kiesel performed the autopsy. He testified that Caruso had eight stab wounds to the chest, five of which could have been fatal. Caruso's hands had defensive-type wounds and her knee had been stabbed. The wounds originated from multiple directions, consistent with a struggle, preventing Dr. Kiesel from determining the position of the attacker.

On June 16, Detective Rinta spoke with Millante about Caruso's murder, although Millante was not a suspect at the time. He denied having dealt drugs with Caruso, stating that she had been Debbie's friend and he had not

known her very well. He also denied any knowledge of Caruso's death. Although he listed his activities on the day Caruso was killed, he omitted having spoken to or met with her.

After his arrest, Millante was held in the same area of the jail as John Piggot. Piggot testified that he learned, from speaking to Millante and overhearing his telephone conversations, that Millante was so angry with Caruso, whom Millante referred to as a "no account bitch," for having a relationship with Debbie that he "ended it." According to Piggot, Millante stated that he was pleading self-defense even though he had intended to kill Caruso. He explained to Piggot that the drug sale was a pretense to get Caruso to the house to "rip her off" and then kill her for her lesbian relationship with Debbie. Millante also told Piggot that he found Caruso's gun only after killing her.

After the State rested, Millante moved to dismiss the charge of first degree murder on the ground that the evidence did not prove either premeditation or felony murder predicated upon second degree robbery. The court denied the motion, finding premeditation supported by the number of wounds and the manner in which they were inflicted and felony murder supported by the fact that a gun and gold chain had been taken from the scene.

Millante testified that he had participated as a middleman in illegal drug deals with Caruso for several years and often arranged to conduct them in the basement of his sister's house. His role was to find a supplier, negotiate the transaction, and bring the supplier and Caruso together for the purchase. Millante reported that Caruso typically bought anywhere from one pound to one kilogram of cocaine at a time, for prices ranging from $8,000 to $22,000. Caruso carried cash and a scale in a bag to the transactions. Millante received between $2,000 and $5,000 for each completed transaction he facilitated. Millante testified that he also worked part-time at a produce stand and that he usually carried a produce knife with him.

At trial, Millante characterized his relationship with Caruso as close. He explained that Caruso had supplied Debbie with cocaine, which he wanted Debbie to stop using. Millante admitted that he had suspected an intimate relationship between Caruso and Debbie.

Millante testified as to the following version of events on June 4. He and Caruso arranged to meet at 9 P.M. regarding a drug deal she had requested he set up. Caruso was going to sample the drugs and confirm the price; she was not going to complete the purchase at that meeting. Caruso arrived carrying a large black bag. After they met, Millante decided to confront Caruso about her relationship with Debbie. He told Caruso that he was going to marry Debbie and did not want Caruso to see Debbie or him any more. He told Caruso that the current transaction would be his last drug deal with her. In response, Caruso taunted him about her affair with Debbie. As Millante walked toward the door, Caruso closed it. She pulled out a gun and stated that she would not let him ruin her. Putting the gun to his head, she said that she should kill him. Millante grabbed the gun, held the trigger, and fell to one knee as she kicked him. To prevent her from shooting him, he stabbed her with the knife he was carrying in his boot. This knife was not the produce knife he usually carried. Millante tried to cover up the incident because he thought he could not explain her death. He took Caruso's body from the basement to the garage and placed it in his car. He denied taking any money from her.

To support his theory of self-defense, Millante presented testimony about several occasions on which Caruso was violent. Once, after visiting her lover's apartment, Caruso threw the gun she was carrying at Millante, telling him to "take 'em." Caruso had also asked him to "chop up" a man who had injured her lover in an auto accident, offering him $25,000 for the job. Several witnesses testified that Caruso kept one of the several guns she owned in the glove box of her truck and sometimes carried another on her person.

The State sought to introduce evidence of Millante's five prior convictions for impeachment purposes. One, a 1972 assault, was excluded as too remote. Another, a 1976 attempted robbery, was admitted under ER 609(a)(2) as a crime of dishonesty. The remaining three, first degree assault in 1976 and two second degree burglaries, one in 1983 and another in 1990, were admitted under ER 609(a)(1).

The jury, instructed on first and second degree murder, found Millante guilty of first degree murder as charged. The trial court imposed a standard range sentence of 450 months.

## MILLANTE'S PRIOR CONVICTIONS

We first address Millante's argument that the trial court erred in permitting the State to introduce evidence of his prior convictions under ER 609. Under that rule, evidence of prior convictions may be admitted in limited circumstances to impeach a witness. Prior convictions involving dishonesty or false statements, which bear directly on the witness's veracity, are per se admissible. ER 609(a)(2). In the present case, the parties agreed that the 1976 attempted robbery qualified as a crime of dishonesty,[1] and Millante does not challenge its admission.

For convictions that do not directly inform the jury of the defendant's ability to tell the truth on the stand, the trial court must determine whether the probative value of admitting the evidence outweighs the prejudice to the party against whom the evidence is offered. ER 609(a)(1). To make this determination, the trial court

---

[1]Although two of Millante's prior convictions were for second degree burglary, which is considered a crime of dishonesty for purposes of ER 609(a)(2) when the underlying crime is theft, *State v. Schroeder*, 67 Wn. App. 110, 114-16, 834 P.2d 105 (1992), the State did not present any evidence of the nature of Millante's burglary convictions and instead argued for admission under the rule's balancing test.

considers the *Alexis*[2] factors: (1) the length of the defendant's criminal record; (2) the remoteness of the prior conviction; (3) the nature of the prior crime; (4) the age and circumstances of the defendant; (5) the centrality of the credibility issue; and (6) the impeachment value of the prior crime. To ensure a meaningful balancing process, the trial court must state the factors that favor admission or exclusion. *State v. Jones*, 101 Wn.2d 113, 122-23, 677 P.2d 131 (1984), *overruled on other grounds by State v. Brown*, 111 Wn.2d 124, 761 P.2d 588 (1988), *adhered to on reh'g*, 113 Wn.2d 520, 782 P.2d 1013, *clarified, on reconsideration*, 787 P.2d 906, 80 A.L.R.4th 989 (1989).

At a hearing to determine the admissibility of Millante's prior convictions, the trial court recited the *Alexis* factors and found that age and circumstances were not important in this case. Regarding the remaining factors, the trial court stated:

> Self-defense being the claim of Mr. Millante here, obviously the credibility issue is paramount, and it is central. It's important that they hear from him to be able to properly make a self-defense claim, but they have no way to evaluate that testimony unless they are aware of exactly what his prior record is.
>
> And the reason I say that is, it's common sense, which is what we assume is what juries are using to make their credibility judgments, common sense recognizes that the defendant with a longer prior criminal history has a stronger self-interest in avoiding punishment; the fact that our sentencing scheme, itself, is built on a grid form that gives longer and longer sentences, depending on a person's prior criminal history, and what motive that gives to a particular defendant to not tell the truth from the stand.
>
> In this particular case, looking at the rest of the *Alexis* factors, the defendant has a rather lengthy criminal record for his age. The impeachment value of the prior crimes would obviously be substantial. The court is concerned about the remoteness of some of these prior convictions.

---

[2] *State v. Alexis*, 95 Wn.2d 15, 19, 621 P.2d 1269 (1980).

■ The decision to admit prior convictions under ER 609(a)(1) lies within the sound discretion of the trial court. *State v. Alexis*, 95 Wn.2d 15, 16, 621 P.2d 1269 (1980).

Millante's primary contention is that, under *State v. King*, 75 Wn. App. 899, 878 P.2d 466 (1994), *review denied*, 125 Wn.2d 1021 (1995), the trial court must identify the specific nature of a prior conviction that gives it probative value. A contrary view was expressed in *State v. Begin*, 59 Wn. App. 755, 801 P.2d 269 (1990). In that case, the Court of Appeals held that prior felonies of whatever nature have "at least some" probative value because they are evidence of non-law-abiding character and, hence, demonstrate a propensity to commit perjury. *Begin*, 59 Wn. App. at 760. We need not resolve the potential conflict between the approaches taken in *King* and *Begin*, however, as any error in the admission of impeachment evidence in the present case was harmless.[3]

■ To merit reversal, Millante would have to demonstrate that, within reasonable probabilities, the outcome of the trial would have been materially affected had the error not occurred. *State v. Ray*, 116 Wn.2d 531, 546, 806 P.2d 1220 (1991); *State v. Roche*, 75 Wn. App. 500, 509, 878 P.2d 497 (1994). The danger of prior conviction evidence is its tendency to shift the jury's focus from the merits of the charge to the defendant's general propensity for criminality. *Jones*, 101 Wn.2d at 120. Here, the jury's attention had already been drawn to Millante's criminal disposition. Millante testified that he had been involved in drug transactions for several years, and his prior conviction for

---

[3]We make the following observations to assist trial judges in determining whether to admit impeachment evidence under ER 609(a)(1). Because of the high risk of prejudice inherent in prior conviction evidence, the trial court should initially focus on whether an alternative basis for impeachment exists, such as eye witness testimony, physical evidence, or automatically admissible prior convictions. When such evidence is available, the need for ER 609(a)(1) evidence to determine credibility is less compelling. *See Alexis*, 95 Wn.2d at 20. Trial courts should also consider the mens rea of the crime being offered. For example, crimes involving intent or knowledge provide more information regarding a defendant's respect for the obligation to speak the truth than do crimes provoked by emotion or for which the mental state is recklessness or negligence.

attempted robbery was automatically admissible under ER 609(a)(2). Thus, it is not likely that admission of other prior convictions affected the jury's verdict. *Cf. Roche*, 75 Wn. App. at 509 (erroneous admission of two prior possession convictions harmless when six other prior convictions were per se admissible and the defendant had admitted using cocaine the morning of the alleged crime).

## ALTERNATIVE MEANS OF COMMITTING FIRST DEGREE MURDER

■ The alternative means of committing first degree murder with which Millante was charged are (1) causing death "[w]ith a premeditated intent" and (2) causing death "in the course of or in furtherance of" committing second degree robbery.[4] RCW 9A.32.030(1)(a), (c). When an offense may be committed by alternative means, the jury must be unanimous as to guilt, but need not be unanimous as to the means if substantial evidence supports each alternative means. *State v. Strohm*, 75 Wn. App. 301, 304, 879 P.2d 962 (1994), *review denied*, 126 Wn.2d 1002 (1995). Because the jury returned a general verdict of guilty in the present case, the evidence must support both means of committing first degree murder with which Millante was charged.

■ By statute, premeditation must involve more than a moment in time. RCW 9A.32.020(1). It is defined as "the deliberate formation of and reflection upon the intent to take a human life and involves the mental process of thinking beforehand, deliberation, reflection, weighing or reasoning for a period of time, however short." *State v. Hoffman*, 116 Wn.2d 51, 82-83, 804 P.2d 577 (1991) (footnote omitted). The evidence, whether direct or circumstan-

---

[4]Millante's pro se argument that he was "forced to guess which degree of Robbery" to defend against and was unaware of the elements of the underlying robbery charge is without merit. An amended information, filed seven months before his trial began, charged Millante with first degree murder committed "with premeditated intent" and in connection with "the crime of Robbery in the Second Degree." An information need not include the elements of the underlying felony. *State v. Hartz*, 65 Wn. App. 351, 354, 828 P.2d 618 (1992).

tial, must support actual reflection or deliberation apart from the commission of the fatal act itself, not merely opportunity to reflect or deliberate. *State v. Bingham,* 105 Wn.2d 820, 826, 719 P.2d 109 (1986).

■ The test for evaluating a challenge to the sufficiency of the evidence is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Green,* 94 Wn.2d 216, 221, 616 P.2d 628 (1980).

Millante correctly asserts that multiple wounds and sustained violence, by themselves, cannot support an inference of premeditation. *See State v. Ortiz,* 119 Wn.2d 294, 312, 831 P.2d 1060 (1992). Other evidence of premeditation includes, but is not limited to, prior threats or quarrels, the planned presence of a weapon, a possible motive for the killing, and defensive wounds on the victim. *See Ortiz,* 119 Wn.2d at 312; *Hoffman,* 116 Wn.2d at 82-83; *State v. Neslund,* 50 Wn. App. 531, 558-60, 749 P.2d 725, *review denied,* 110 Wn.2d 1025 (1988).

A defendant challenging the sufficiency of the evidence admits the truth of the State's evidence and all inferences that can reasonably be drawn in favor of the State. *State v. Salinas,* 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). Viewed in this way, the evidence in the present case supports an inference of premeditation. First, Caruso suffered multiple stab wounds and had defensive type wounds on her hands. Second, Piggot's testimony provides evidence of deliberation and motive, using a drug transaction as a ruse to rob and kill Caruso. Third, the fact that Millante arranged the meeting, secured access to the garage, and asked his sister to leave the house further supports a finding of deliberation. Finally, the knife that Millante brought to the meeting was not the knife he normally carried, indicating he planned the presence of the murder weapon. We find that this evidence, taken together, is sufficient to allow a rational juror to find actual reflection and deliberation beyond a reasonable doubt.

■ The evidence must also support the alternative charge of felony murder. In general, a felony murder conviction must be supported by sufficient evidence of each element of the predicate felony. *State v. Maupin*, 63 Wn. App. 887, 892, 822 P.2d 355, *review denied*, 119 Wn.2d 1003 (1992). Second degree robbery, the underlying felony with which Millante was charged, occurs when a person

> unlawfully takes personal property from the person of another . . . against his will by the use or threatened use of immediate force, violence, or fear of injury to that person or his property . . . . Such force or fear must be used to obtain or retain possession of the property, or to prevent or overcome resistance to the taking[.]

RCW 9A.56.190, .210. Millante contends that the State failed to prove the force or fear of force element, arguing that his testimony that he took Caruso's property after he killed her in an attempt to cover up the murder demonstrates the absence of proof of that element.

■ ■ Washington courts have rejected the type of argument Millante raises. When felony murder is charged, "the statute does not require the state to prove the intent with which a murder is committed[.] [W]hen it is done in connection with the perpetration of a robbery, mere lack of an intent to rob at the moment of the killing is not a defense." *State v. Craig*, 82 Wn.2d 777, 783, 514 P.2d 151 (1973). The court in *Craig* explained that

> [t]he state could prove that there was a robbery and a murder. It could not prove what the defendants were thinking when they committed the murder, except by inference from the circumstances. Having killed and robbed the victim, the appellant cannot now be heard to say that his intentions were pure when he administered the blows which resulted in the death of the victim.

*Craig*, 82 Wn.2d at 782.

For felony murder, the homicide and the underlying felony must be part of the same transaction, not separate,

distinct, and independent from it. *State v. Temple*, 5 Wn. App. 1, 7, 485 P.2d 93 (1971). The fact that a homicide precedes the final act of robbery does not necessarily fragment the transaction. *Temple*, 5 Wn. App. at 7-8. A homicide is "deemed committed during the perpetration of a felony, for the purpose of felony murder, if the homicide is within the 'res gestae' of the felony, *i.e.*, if there was a close proximity in terms of time and distance between the felony and the homicide." *State v. Leech*, 114 Wn.2d 700, 706, 790 P.2d 160 (1990) (footnote omitted).

The evidence presented here, viewed most favorably to the State, supports a finding that the killing and the robbery were part of the same transaction. The State presented Piggot's testimony that Millante had arranged the meeting with the intention of robbing Caruso. Millante does not deny that he took Caruso's gun and gold chain. The evidence supports the inference that he also took several thousand dollars from her that night. There was testimony that Caruso usually carried a bag with large quantities of cash to drug transactions (between $8,000 for an ounce and $22,000 for a kilogram), that Millante knew of this custom, and that Caruso brought a large black bag to their drug-related meeting on June 4. The following day, Millante spent $8,000 cash on a car.

The evidence was sufficient to support a finding of both premeditation and felony murder predicated on second degree robbery. Therefore, there was a sufficient evidentiary basis for Millante's first degree murder conviction.

## PROSECUTORIAL MISCONDUCT

We last consider Millante's argument that the prosecutor's comments during closing argument deprived him of a fair trial. In closing argument, a prosecutor is afforded wide latitude in drawing and expressing reasonable inferences from the evidence, including commenting on the credibility of witnesses and arguing inferences about credibility based on evidence in the record. *State v. Hoffman*, 116 Wn.2d 51, 94-95, 804 P.2d 577 (1991); *State v.*

*Knapp*, 14 Wn. App. 101, 110-11, 540 P.2d 898, *review denied*, 86 Wn.2d 1005 (1975). A prosecutor must not, however, express a personal belief as to the credibility of witnesses. *State v. Papadopoulos*, 34 Wn. App. 397, 400, 662 P.2d 59, *review denied*, 100 Wn.2d 1003 (1983). A defendant must establish the impropriety of the prosecuting attorney's comments and their prejudicial effect, keeping in mind that the appellate court will consider the context in which alleged improper statements are made. *Hoffman*, 116 Wn.2d at 93; *Papadopoulos*, 34 Wn. App. at 400.

 Millante contends that he was denied a fair trial when the prosecutor (1) characterized him as someone who had lied about the circumstances surrounding Caruso's death and (2) illustrated that point by comparing Millante's testimony with a short story written by Edgar Allan Poe. We fail to find any impropriety in the prosecutor's statements. The evidence shows that Millante lied to police when first questioned about his involvement with Caruso's death and her drug dealings. The prosecutor argued that this untruthful behavior indicated Millante was not a credible witness and that he could have also lied when he testified that he killed Caruso in self-defense. Use of the word "lie," even though repeated, does not, by itself, establish prosecutorial misconduct. Millante fails to suggest how or why use of a literary analogy in arguing an inference from the evidence is improper. Read in context, it is clear that the prosecutor's statements were proper comments on credibility that were based on evidence in the record.

The judgment of the trial court is affirmed.

AGID and ELLINGTON, JJ., concur.

Review denied at 129 Wn.2d 1012 (1996).