

COURT OF APPEALS
STATE OF...

2018 FEB -5 AM 9: 50

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 75004-6-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| MALIKA PA, | ) | |
| | ) | |
| Appellant. | ) | FILED: February 5, 2018 |

SCHINDLER, J. — Twenty-one year old Natsanet Teke died after the driver of the car, Malika Pa, struck another car and then flipped over several times before crashing into a utility pole. The State charged Pa with vehicular homicide, vehicular assault, two counts of reckless endangerment, and felony hit and run. The State charged the driver of the car Pa struck, John Coleman, with felony hit and run. The jury convicted Pa and Coleman as charged. Pa seeks reversal of the jury convictions. Pa argues (1) the trial court violated her constitutional right to confrontation by admitting statements Coleman made to a detective, (2) the trial court abused its discretion by overruling an objection to testimony referring to Teke's infant daughter, and (3) prosecutorial misconduct during closing argument and cumulative error deprived her of the right to a fair trial. We affirm.

## FACTS

At approximately midnight on October 19, 2013, 19-year-old Malika Pa picked up her friends Natsanet Teke, Briana Manson, and Kelani Duell in her black Acura SUV.[1] Duell saw a bottle of "white Remy"[2] in the car. Duell testified that Pa had been drinking and was "a little turned up."

The four young women went to an IHOP restaurant in Seattle to meet a group of friends, including John Coleman and DeShawn Weatherly. A couple of hours later, the group decided to go "to a friend's house and chill the rest of the night." The group left in five or six different cars and drove to a nearby gas station. Teke was sitting in the front passenger seat of Pa' car. Manson and Duell were in the backseat. While at the gas station, Pa drank a can of Four Loko.[3]

After leaving the gas station, the drivers traveled southbound on 23rd Avenue "following each other back to back." The night was foggy and damp. The speed limit is 30 m.p.h. but all of the drivers were driving "pretty fast." Coleman was in a silver Saturn directly in front of Pa's car.

Manson testified that Pa turned the radio volume "all the way up" and was "dancing around as she was driving" and not "paying attention to her driving." Manson estimated that Pa was driving approximately 50 m.p.h. Duell testified that Pa was driving "[d]umb . . . . Like she didn't know how to drive." Duell said that Pa was driving too fast and "[t]here were multiple arguments" about Pa's

---

[1] Sport utility vehicle.

[2] Rémy Martin V, a distilled grape spirit.

[3] Four Loko is a flavored malt beverage.

driving. Duell estimated Pa was driving as fast as 60 m.p.h. Duell later told Detective Thomas Bacon that Pa "was racing with a guy she'd met at the IHOP."

As the cars approached the intersection of 23rd Avenue South and South King Street, the black Acura and the silver Saturn were in the left southbound lane. DeShawn Weatherly was driving his car slightly ahead of Pa in the right southbound lane. Manson said Pa was still dancing to music on the radio and not paying attention to driving. Manson testified that Pa accelerated and crossed into the oncoming northbound lane of traffic to pass Coleman's silver Saturn. Duell testified Pa "tried to get back over and in the process, I don't know if another car tried to move or what the case may have been, but we smacked the back of a car." Pa's car then flipped over several times before crashing into a utility pole. Teke was ejected through the sunroof and died.

Manson climbed out of the sunroof of the SUV. Duell's leg was pinned between the backseat and the ground. Manson helped Duell out of the car. The collision resulted in a fracture to Duell's right femur. Manson saw Teke lying on the sidewalk. Pa was "standing over [her] body screaming." Manson went over to Teke. When she "looked up," Pa "was gone."

Bystander Paul Hemel testified that he was parking his car on South King Street near 23rd Avenue South at approximately 3:40 a.m. Hemel heard a car accelerate and approximately three seconds later, he heard a crash. Hemel ran toward 23rd Avenue South and "ran over to the scene" to assist the victims. Hemel heard someone who was "hysterical" say, "I don't know why you had to drive so fast." Hemel saw a car drive up and someone said, "[W]e need to get

the fuck out of here." Hemel watched as "a taller either African American or Asian woman" got into the car. The car "sped off in the opposite direction."

When the police arrived, Pa and Coleman were gone. A police officer testified that "the top of the [SUV was] crunched pretty much all the way down onto the head rest" and he was "surprised" that anyone in the car survived. The police found a "bottle of Remy" and an empty can of Four Loko near the SUV.

Pa returned approximately an hour later with her mother. Pa identified herself as the driver of the black SUV. Pa told Officer Michael Lewis she was not injured. Pa described how the accident occurred. Officer Lewis testified:

> Ms. Pa told me that she was traveling southbound on 23rd Avenue South, alongside another car, which she said was also speeding. She told me that a third car approached from the rear, and that she had swerved to avoid being struck, to be — avoid being in a collision, at which time she lost control of her car and crashed.

Officer Lewis is a trained expert in detecting whether drivers are under the influence of alcohol or drugs. Officer Lewis testified that Pa appeared "sleepy" and "slow" and her eyes were "reddened" and "droopy." Pa told Officer Lewis she consumed only "a sip" of alcohol that evening. Officer Lewis testified that a several-hour delay in obtaining a blood draw was significant because alcohol burn-off rate can impact the results of the test.

Detective Bacon interviewed Coleman by phone. Coleman told Detective Bacon that when he slowed down to turn left onto South King Street, a car "sideswiped" his car. Coleman admitted he left after the accident.

The State charged Pa with vehicular homicide of Natsanet Teke, vehicular assault of Kelani Duell, two counts of reckless endangerment of Briana Manson

and John Coleman by engaging in conduct "which did create a substantial risk of death and serious physical injury" by speeding and driving in "no passing zones," and felony hit and run. The State charged Coleman with felony hit and run.

Several witnesses testified at trial, including Manson, Duell, Weatherly, Hemel, Officer Lewis, and Detective Bacon. The trial court admitted more than 80 exhibits into evidence, including a videotape from the IHOP parking lot and photographs from the gas station and of the car accident. Neither Pa nor Coleman testified.

Detective Bacon testified that Weatherly told him, "I think the Saturn was trying to make a left, and [Pa] was going [sic] the wrong side of the road, and hit the Saturn." Weatherly told Detective Bacon that Pa was "driving like crazy" when she "left IHOP."

But at trial, Weatherly testified that just before the accident, "I think [Coleman] was trying to turn." Coleman "was trying to avoid . . . hitting the [white] car in front of him" and was "panicking and swerving." Weatherly said that when the white car "slammed on his breaks," Coleman swerved into the left lane, cutting in front of Pa, and slammed on his brakes to avoid hitting the car in front of him. According to Weatherly, Pa "just swerved" to avoid hitting Coleman's Saturn. Weatherly testified that Pa was trying to come to "a nice safe stop" when the car "flipped and rested against a telephone pole." Weatherly admitted that after the accident, he drove away with Pa.

Detective Bacon testified about the statements Coleman made in the telephone interview. Detective Bacon testified, in pertinent part:

> Q     And you took [Coleman's] statement in October, so were you referring to October 18th?
> A     Yes.
> Q     And what was his response?
> A     He said right — I went to actually a party and then after the party to IHOP to eat and then after IHOP, we all went to 76 to get gas. And we were a lot of cars, we were all going to a friend's house and chill the rest of the night.
> Q     One moment. And then did he continue on and — at the bottom of that first page — and indicate what he was doing?
> A     Yes.
> Q     And what did he say?
> A     He said and I was told it was over in — the light over in Lange somewhere — but we never made it there to see. So on our way down from the gas station, we were all going down 23rd in about five or six cars and we followed — following each other back to back and were going pretty fast down 23rd from Union to about Garfield [High School]. Then it gets a little slow because of the lights and stuff. And I'm being the lead car going as we go through — the light on Jackson. I'm making my turn like I'm going into a left[-]hand turn on King Street, the block after Jackson, and as I ease into my turn, get sideswiped by a car.

Coleman admitted to Detective Bacon that after the accident, he left and did not contact the police.

Pa's attorney objected to Detective Bacon's testimony, arguing, "I do think that there are portions that are objectionable under the confrontation clause." Defense counsel argued admission of the statement that "his car was sideswiped" violated Pa's right to confrontation under Bruton v. United Sates, 391 U.S. 123, 88 S. Ct. 1620, 20 L. Ed. 2d 476 (1968). The court ruled the statement that Coleman "was making a left turn and got sideswiped" did "not violate the confrontation clause." But the trial court agreed to Pa's request to instruct the jury to consider the statements Coleman made to Detective Bacon only as to the

charges against Coleman and not against Pa. The trial court orally instructed the jury as follows:

> All right, so members of the jury, testimony by Detective Bacon concerning alleged statements made to him by Mr. Coleman may be considered by you only when considering the charges against — the charge against Mr. Coleman. You may not consider the testimony when considering the charges against Ms. Pa.

The written jury instructions reiterate the court's oral instruction.

> You may consider a statement made out of court by one defendant as evidence against that defendant, but not as evidence against another defendant.

In addition, the written instructions tell the jury to decide each count charged as to each defendant.

> A separate crime is charged in each count. You must separately decide each count charged against each defendant. Your verdict on one count as to one defendant should not control your verdict on any other count or as to any other defendant.

The jury convicted Coleman of felony hit and run. The jury convicted Pa as charged of vehicular homicide, vehicular assault, two counts of reckless endangerment, and felony hit and run. By special verdict, the jury found Pa's vehicle was involved in an accident resulting in death and injury to others and Pa operated the motor vehicle in a reckless manner without regard for the safety of others. The court imposed a standard range concurrent sentence. On appeal, Pa seeks reversal of the convictions.

ANALYSIS

Confrontation Clause

Pa contends the court violated her constitutional right to confrontation by allowing Detective Bacon to testify about Coleman's statements. Pa asserts admission of the nontestifying codefendant's statement that "his car was sideswiped" violated the Confrontation Clause of the Sixth Amendment to the United States Constitution under Bruton.

The Sixth Amendment guarantees an accused the right to confront the witnesses against him. U.S. CONST. amend. VI; Crawford v. Washington, 541 U.S. 36, 42, 51, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). We review alleged violations of the Confrontation Clause de novo. State v. Fisher, 185 Wn.2d 836, 841, 374 P.3d 1185 (2016).

In Bruton, the confession of the codefendant "expressly implicat[ed]" the defendant as his accomplice. Bruton, 391 U.S. at 124 n.1. The Court concluded admission of the confession of a nontestifying codefendant that named the defendant as a participant in the crime violated the Sixth Amendment right to confrontation despite an instruction to the jury to consider the confession against only the codefendant. Bruton, 391 U.S. at 127-28.

In Richardson v. Marsh, 481 U.S. 200, 107 S. Ct. 1702, 95 L. Ed. 2d 176 (1987), the Court clarified the holding in Bruton. The Court held Bruton does not apply unless the codefendant's statements facially incriminate the defendant.

8

Richardson, 481 U.S. at 208-11. The "calculus changes when confessions that do not name the defendant are at issue." Richardson, 481 U.S. at 211.

> [T]he Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence.

Richardson, 481 U.S. at 211. The Court concluded that if a nontestifying codefendant's confession becomes incriminating "only when linked with evidence introduced later at trial," there is no "overwhelming probability" that the jury will disregard a limiting instruction. Richardson, 481 U.S. at 208. Under Richardson, only facially incriminating statements violate the Confrontation Clause. Statements that are incriminating only by connection to other evidence do not. Richardson, 481 U.S. at 208-09; Fisher, 185 Wn.2d at 842-43.

The statements Coleman made to Detective Bacon do not violate Bruton and are not facially incriminating. The statements do not expressly refer to or name Pa. Coleman stated he was the lead car through the intersection of 23rd Avenue South and South Jackson Street. Coleman said that when he "ease[d]" to make a left-hand turn at the intersection of 23rd Avenue South and South King Street, he was "sideswiped" by another vehicle. We also note the unchallenged testimony that established Pa's car hit the side of Coleman's car before flipping over several times and crashing into a utility pole. The trial court did not err in admitting Coleman's statements to Detective Bacon.

And even if error, the error was harmless. A violation of the Confrontation Clause is subject to a harmless error analysis. Chapman v. California, 386 U.S. 18, 22-24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967).

> Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

Delaware v. Van Arsdall, 475 U.S. 673, 684, 106 S. Ct. 1431, 1438, 89 L. Ed. 2d 674 (1986).

Duell testified that Pa had been drinking alcohol throughout the evening. Manson and Duell testified that just before the collision, Pa was dancing in the car and not paying attention to driving. Manson and Duell testified that Pa was driving well over the speed limit in dark and foggy conditions. Manson and Duell testified that Pa accelerated into oncoming traffic in an attempt to pass Coleman's car before hitting a car and losing control of the car. We conclude any error was harmless beyond a reasonable doubt.

Prosecutorial Misconduct

Pa argues prosecutorial misconduct during closing argument denied her the right to a fair trial. For the first time on appeal, Pa contends the prosecutor improperly vouched for witness credibility by expressing a personal belief as to the truth of Coleman's version of the accident.

To prevail on a claim of prosecutorial misconduct, a defendant must show the prosecutor's conduct was both improper and prejudicial. State v. Ish, 170

Wn.2d 189, 195, 241 P.3d 389 (2010). We review alleged prosecutorial misconduct in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury. State v. Monday, 171 Wn.2d 667, 675, 257 P.3d 551 (2011).

Pa challenges the portion of closing argument where the prosecutor addressed the elements of the charges against Coleman:

> Now there's — during opening statement there was a number of comments about it's not [Coleman's] fault. He didn't — he didn't cause the collision. He didn't do this. He was just doing a left hand turn. Agreed. The State is not contesting that. The State believes that he was making a left hand turn. It appears that the evidence supports that. That's not what he's charged with. He's not over there charged with vehicular homicide or vehicular assault or reckless endangerment. None of that. So the fact that he executed a proper turn is not — not relevant. That's not one of the elements that the State has to prove that he caused the accident. It just says he was involved in an accident and that's what hit and run is.[4]

Pa did not object. Where a defendant fails to object or to request a curative instruction, any error is waived unless the conduct is "so flagrant and ill intentioned that it evinces an enduring and resulting prejudice" that could not have been neutralized by a curative instruction to the jury. State v. Hoffman, 116 Wn.2d 51, 93, 804 P.2d 577 (1991). Under this heightened standard, the defendant must show (1) no curative instruction would have obviated any prejudicial effect on the jury and (2) the misconduct resulted in prejudice that had a substantial likelihood of affecting the jury verdict. State v. Emery, 174 Wn.2d 741, 761, 278 P.3d 653 (2012). We "focus less on whether the prosecutor's

---

4 Emphasis added.

misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured." Emery, 174 Wn.2d at 762.

It is misconduct for a prosecutor to vouch for a witness by expressing his or her personal belief as to the truthfulness of the witness's testimony. Ish, 170 Wn.2d at 196. But a prosecutor has wide latitude to draw reasonable inferences from the evidence and may comment on the credibility of a witness based on evidence in the record. State v. Millante, 80 Wn. App. 237, 250, 908 P.2d 374 (1995). Prejudicial error does not occur unless it is clear and unmistakable that counsel is expressing a personal opinion and not arguing an inference from the evidence. State v. Copeland, 130 Wn.2d 244, 290, 922 P.2d 1304 (1996).

Even if the prosecutor's assertion that "[t]he State believes that [Coleman] was making a left hand turn" is characterized as an improper personal belief as to the truth of Coleman's statement, Pa cannot show prejudice. First, the prosecutor told the jury, "It appears that the evidence supports that." Second, any prejudice could have been mitigated by a timely objection and a curative instruction.

Testimony Referring to Teke's Infant Daughter

Pa contends the trial court erred by allowing Teke's father to testify about "the impact of Teke's death on her infant daughter and other family members." Pa argues the testimony violated a motion in limine ruling and was an improper appeal to the passion and prejudice of the jury. The record does not support Pa's argument.

12

On the first day of trial, the prosecutor said the State planned to call Teke's father Teke Asegay as the first witness. The prosecutor stated:

The . . . testimony is . . . relatively limited. [Asegay] is going to testify about his daughter and who she . . . was, and that she got picked up by the Defendant on that particular evening and how he was notified of . . . the accident. And that's basically going to be the extent.

Defense counsel objected to testimony about family members Teke "left behind."

With regards to what the State is going to ask her about — about who his daughter is, I . . . want to make sure that there's nothing that's . . . not relevant to this, like there's, you know, I don't want him asking about . . . who her family members are, you know, anything out there . . . that she had, you know, she left behind — you know, siblings or children, or things like that that would be emotional issues versus factual issues that are related to this case.

In response, the prosecutor clarified:

Your Honor, [Asegay is going to] testify . . . who his . . . family is, how many children he has, and that . . . [Teke] was one of his children, how old . . . was she at the time. I'm going to have him identify a photograph of her that was taken the week before the — the accident so the jury knows what she looks like when she was alive. And that on that particular evening Ms. Pa . . . picked her up and I — I want to — I'm not sure exactly what time, but that she was the one that picked her up on the evening the last time he saw her, and how they were notified of the accident and that she — and I believe that's it.

Pa objected to "any reference to siblings or [Teke's] children, her own, as not relevant and prejudicial." The trial court stated, "The father can justify [sic] that . . . [Teke] is one of his children and he has X number of children. I mean, that's about it. I don't think he needs to go into great detail about . . . that."

Without objection, Asegay testified that on October 18, 2013, he "came [home] from work" and "[m]y wife, [Teke,] and her daughter were home." Asegay

testified that Teke received a phone call after dinner and he overhead her saying, "[N]o, I'm not going to leave the house, I want to . . . stay with my kid." Asegay testified that Teke later changed her mind and told her mother, "I haven't been out for about a month . . . so, Mom, please if you can take care of the baby, I want to go out." Pa did not object to this testimony.

During Asegay's testimony, the prosecutor introduced into evidence a photograph of Teke.[5] The prosecutor asked Asegay when the photograph was taken. Asegay responded, "A week before she died. That was during the christening of her daughter." Defense counsel objected to the testimony as barred by the motion in limine ruling. The court overruled the objection.

> Q    Now, you mentioned that . . . the picture was taken about a week before she died.
> A    Yeah, that [sic] what it was, about a week ago, and the — there — it was the christening of her daughter.
> Q    Of [Teke]'s daughter?
> [DEFENSE COUNSEL]:    Objection.
> THE WITNESS:    Yes, [Teke]'s daughter.
> THE COURT:    Yes? What's your objection?
> [DEFENSE COUNSEL]:    Motion in limine.
> THE COURT:    Overruled.
> Q    And how old was [Teke]'s daughter?
> A    About three months plus. In our culture, a girl is christened in 80 days, so that's three months plus — . . . or two months plus.

Because Asegay did not testify about the impact of Teke's death on her infant daughter and the testimony did not violate the motion in limine ruling, the trial court did not abuse its discretion in overruling the objection. In any event, any error was harmless. See, e.g., State v. Neal, 144 Wn.2d 600, 611, 30 P.3d

---

[5] The photograph shows only Teke's face.

1255 (2001) (improper admission of evidence constitutes harmless error if the evidence is of minor significance in reference to the evidence as a whole). Without objection, Asegay testified several times that Teke had a baby. There was no reasonable likelihood the challenged testimony affected the outcome of the trial.

<u>Cumulative Error</u>

Pa argues cumulative error deprived her of a fair trial. Cumulative error may warrant reversal even if each error standing alone would otherwise be considered harmless. <u>State v. Greiff</u>, 141 Wn.2d 910, 929, 10 P.3d 390 (2000). But where, as here, "the errors are few and have little or no effect on the outcome of the trial," the cumulative error doctrine does not apply. <u>State v. Weber</u>, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).

We affirm the jury convictions of vehicular homicide, vehicular assault, two counts of reckless endangerment, and felony hit and run.

WE CONCUR: