IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Personal Restraint Petition | No. 87373-3-I |
| of | DIVISION ONE |
| JOHNNIE LEE LAY, JR., | UNPUBLISHED OPINION |
| Petitioner. | |

SMITH, J. — In 2007, T.R. reported she had been sexually assaulted. A decade later, the Seattle Police Department reopened the investigation and, in 2018, charged Johnnie Lee Lay, Jr. with rape in the second degree. At Lay's first trial in 2019, the court declared a mistrial due to a hung jury. On retrial in 2020, the jury found Lay guilty of rape in the second degree. Lay appealed and this court affirmed his conviction in 2022.

In 2023, Lay filed this personal restraint petition contending (1) the State allowed false testimony to be presented at trial, (2) the State withheld evidence, (3) his counsel was ineffective, (4) there is newly discovered evidence, and (5) he is entitled to a new trial because of cumulative error.

We conclude Lay's counsel was ineffective and he was prejudiced as a result. We grant his petition and remand for further proceedings.

FACTS

Background

On March 14, 2007, T.R. left Angeline's, a women's shelter in Seattle, Washington, where she resided, to go for a walk.[1]  Near the intersection of Pike Street and Second Avenue, a car pulled up in front of T.R. and a man, later identified as Johnnie Lee Lay, Jr., jumped out of the car, grabbed T.R., and threw her in the back seat.  Lay got into the passenger seat and the driver, who was never identified, drove away.

Over the course of the next several hours, Lay repeatedly raped T.R. in the car and at an unidentified wooded area.  While in the backseat of the car, Lay threatened T.R. with a screwdriver.  At one point, Lay dropped an identification card and T.R. saw the name "John Lay."  Eventually, Lay threw T.R. out of the car.  T.R. returned to Angeline's, where she reported the rape and called police.

An officer with the Seattle Police Department (SPD) took T.R.'s statement and accompanied her to the hospital, where she underwent a full sexual assault examination.  The examination included collecting several swabs for deoxyribonucleic acid (DNA) testing.  A nurse observed a laceration near T.R.'s vagina and bruising on her thigh.

SPD assigned Detective Ishimitsu to T.R.'s case.  He reviewed the police report and T.R.'s medical records and telephoned T.R. to arrange an interview. T.R. did not show up on the scheduled interview date.  Detective Ishimitsu tried

---

[1]  Unless indicated otherwise, the facts come from this court's unpublished opinion in *State v. Lay*, No. 82428-7-I (Wash. Ct. App. June 21, 2022) (unpublished), https://www.courts.wa.gov/opinions/pdf/824287.pdf.

to follow up with T.R. via telephone and letter, but T.R. never responded. Detective Ishimitsu searched SPD's database for "John Lay," the name T.R. had seen on the identification card, and found several individuals with similar names, but he was unable to make a positive identification of the suspect. Because T.R. was unresponsive and Detective Ishimitsu was unable to proceed with the case, Detective Ishimitsu followed department policy in effect at the time and did not send the sexual assault kit for testing and inactivated the case.

In 2015, the Washington Legislature passed a law requiring the testing of all sexual assault kits in law enforcement custody. In June 2016, SPD sent T.R.'s test kit to the state crime lab for testing. The DNA sample taken from T.R. matched Lay, who was already in the FBI's Combined DNA Index System as a result of prior convictions. In March 2018, SPD reassigned the case to Detective Shawn Martinelli. After completing his investigation, Detective Martinelli submitted the case to the prosecutor's office for possible charges. Lay, who was living in Illinois at the time, traveled to Seattle voluntarily for his arraignment. The State charged Lay with first degree rape. Lay's first trial ended in a mistrial with a hung jury. The State amended the charge to second degree rape and a second trial commenced in September 2020.

## Trial Testimony

Both Lay and T.R. testified at the second trial. T.R. testified that she was introduced to crack cocaine at Angeline's, but was not a heavy user at the time. T.R. recounted that on the day of the rape, she took one hit off her pipe before Lay and the driver pulled up in a white Cadillac and threw her in the car. She

3

testified that Lay first raped her in a wooded area and then multiple times in the backseat of the car.

Lay testified in his own defense. He admitted to having sex with T.R. but claimed T.R. had approached him and offered to have sex with him in exchange for crack cocaine. Lay maintained the sex was consensual.

The sexual assault nurse examiner (SANE), Carol Stewart, who met with T.R. after the rape also testified at trial. Stewart recounted from her report that T.R. had told her "[Lay] forced her to take crack cocaine." In a questionnaire filled out during the exam with Stewart, T.R. indicated "yes" when asked about "forced drug ingestion."

The jury convicted Lay of rape in the second degree. Lay appealed, arguing the State violated the statute of limitations, the delay in bringing charges violated his due process rights, and his right to an impartial jury was violated. Lay also raised several arguments in a statement of additional grounds, including two allegations of prosecutorial misconduct and a failure by law enforcement to read him his *Miranda*[2] warning. The court found Lay's arguments meritless and affirmed the trial court's ruling.

Civil Lawsuit

Prior to Lay's criminal conviction, T.R. engaged an attorney to assist with a civil lawsuit against the City of Seattle and the State of Washington concerning

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

4

the delay in testing her sexual assault kit.[3]  In April 2019, T.R.'s attorney, Julie Kays, made a public disclosure request for documents related to Lay's case. Then, in June 2019, Kays e-mailed a notice of appearance in the criminal case directly to Lay's defense attorney.  The notice included the name of Kays's firm and described her as working "pro bono on behalf of [T.R.]."

Kays also exchanged e-mails with the prosecutor for Lay's criminal case, Maggie Qerimi.  In one e-mail, Kays noted that she didn't plan on being at the criminal trial because she thought "it create[d] the potential for issues."  She then noted she was "pro bono for [T.R.] on any discovery issues that may come up." Kays and Qerimi continued to correspond throughout Lay's criminal trial, including updates from Qerimi to Kays on the status of the proceeding and the result of dispositive motions.  In one exchange, Kays asked Qerimi how the trial was going, to which Qerimi replied, "The defendant will definitely take the stand." Kays wrote back, "Here's hoping he opens the door to his priors!!" and asked Qerimi to "keep [her] posted."

In March 2022, the State deposed Qerimi in relation to T.R.'s civil lawsuit. The following exchange occurred concerning when Qerimi became aware T.R. was filing a civil lawsuit:

> [Civil Attorney]:  When did you first become aware that [T.R.] was going to file a civil lawsuit against the Department of Corrections and/or the City of Seattle?
>
> [Qerimi]:  I knew that a lawsuit was going to happen.  I wasn't actually sure who the target was.  And I can't—I cannot tell you if I knew—like, when I knew.  I can't . . . pinpoint that.

---

[3] T.R. did not remember the exact date and was not able to recall if she retained her attorney during the first or second trial.

5

[Civil Attorney]: Did you know before the . . . second criminal trial of Jonny Lay?

[Qerimi]: I think so, but I honestly don't—it wasn't an important detail to me, so I don't remember.

[Civil Attorney]: Okay.

[Qerimi]: I think when victims of sexual assault have private attorneys in addition to a victim advocate, the assumption for me is that that might be something that they 're considering, but I don't know for sure. Like, I have no idea when the lawsuit was filed or where, you know, any of that stuff.

[Civil Attorney]: Okay. And was it your assumption when Julie Kays contacted you, that that was her private attorney that was more than likely going to file a civil lawsuit in this case?

[Qerimi]: I wouldn't—I don't know that I would say more than likely because we never discussed a lawsuit in detail. I don't actually know that Julie Kays and I ever discussed a lawsuit in detail prior to the second criminal trial.

I know I heard it from somewhere. I don't know if I heard it from the victim advocate or from [T.R.] herself or I knew Julie [Kays] was her attorney. So it was probably going to come from Julie [Kays]. I think I made those assumptions, but . . . I had not sat down and had a discussion about a lawsuit with anyone.

[Civil Attorney]: Sure.

[Qerimi]: You know, in any, like, meaningful detail.

[Civil Attorney]: Okay. Do you know how long after the second criminal trial the notice of tort claim was filed with the City of Seattle?

[Qerimi]: Oh, I have no idea. I didn't even know it was—well, I guess maybe I would have assumed it was after the second trial, but I don't know.

[Civil Attorney]: Before or during the second trial, it became—you knew that a civil lawsuit was going to be filed by [T.R.].

[Qerimi]: I knew that it was, like, a thought being considered, but I had no idea that it was, in fact, going to happen. When it happens before trial, it's a fact that I—it's important for me to know, because it might be explored at trial, and I need to be able to explore that with the witness.

6

Which is why I think . . . it didn't happen before the trial. But I . . . could not tell you that [T.R.] was 100 percent set on bringing a lawsuit.

The civil attorney subsequently asked Qerimi if Kays's notice of appearance was the first time she became aware of Kays's involvement in the civil case, to which Qerimi answered, "I don't know."

T.R. was also deposed in the civil case. During her deposition, T.R. stated she started using crack cocaine prior to living at Angeline's. She admitted that her testimony at both trials, where she testified that she was introduced to crack cocaine at Angeline's, was inaccurate. T.R. confirmed that in 1998, she was in a motor vehicle accident after "being on a six-day crack binge."

The State also asked T.R. about an interview she had with a social worker in 2007. In that interview, T.R. told the social worker the last time she had smoked crack was when the two men (on the night of the rape) forced her to smoke. But during her deposition, T.R. stated that was not accurate—she never smoked crack with the two men.

The State also took the deposition of T.R.'s friend, Amanda Harless.[4] Harless was a State's witness in Lay's criminal case. Lay had requested to interview Harless, but Qerimi said they were having trouble reaching Harless, and the interview never took place. Lay did not pursue an interview himself and, instead, moved to exclude Harless's testimony based on his inability to

_____

[4] At the time of Harless's deposition—February 16, 2022—Harless had not spoken with T.R. since November 2021. When T.R. was asked about the state of her friendship with Harless, T.R. said, "Well, we were good friends and then, you know, right now, we're not speaking. It's just a—you know, I consider her my sister so it's like a sister spat right now."

7

coordinate a pre-trial interview. Ultimately, the State decided not to call Harless to testify.

In her deposition, Harless stated she knew T.R. during the time T.R. lived at Angeline's and saw T.R. the day after Lay raped her. Harless testified that T.R. did not talk to her about what happened that day, but Harless remembered T.R. "looked really distraught, scared, and just totally trying to process what happened." Harless recounted that T.R. did not tell her all the details about the rape until three or four years later. Harless recounted the following:

> [T.R.] finally told me that she was raped by a black man, that she was—all she remembers is that she was thrown into the back of a van, and then taken to an alley and raped several times, and then just brought back and dumped off. That's all she basically told me at that point.

Harless noted an inconsistency in T.R.'s recounting of the event over time concerning the location where Lay grabbed her off the street, but Harless noted the one detail that never changed was that "[T.R.] said that she was raped in the back of a van." Harless said T.R. opened up more about the rape after the State charged Lay and the criminal trial approached. When asked what else T.R. had told Harless, the following conversation ensued:

> [Harless]: Nothing, nothing new really. It was just kind of her repeating herself, going over it and telling me what I should say almost. She did try to get me to say things, and I told her I wasn't going to lie, that I'm going to be honest and truthful, and you know, do my best to remember back then.
>
> [Civil Attorney]: Fair enough. So what did she do that made you think she was trying to get you to testify a certain way?
>
> [Harless]: It was basically her words to say, you know, try to tell me, you know, you need to say this, you need to say that. And I don't even remember half of the things she wanted me to say. I just know that I wasn't going to say them because it wasn't truthful.

It was pretty much me trying to say things that she would remember that she should have stated and not I, me stating it.

[Civil Attorney]: So there were things you don't recall that she wanted you to say you recalled?

[Harless]: Yes.

[Civil Attorney]: And when did she put—when did she do this?

[Harless]: I think the first time she started doing it was like, I want to say as early as 2019, all the way up.

In October 2022, the State settled the lawsuit with T.R. for $1.5 million. T.R.'s claims against the City were dismissed. *See* [*T.R.*] *v. State*, No. 84646-9-I (Wash. Ct. App. Nov. 27, 2023) (unpublished), https://www.courts.wa.gov/ opinions/pdf/846469.pdf. Lay subsequently filed this timely personal restraint petition (PRP).

<u>Burkland's Declaration</u>

Attached to Lay's PRP is a signed declaration from his trial counsel, Reid Burkland. In the declaration, Burkland states that his goal for trial was to show that T.R.'s assertions were not reasonable in the context of the other evidence and to question her credibility as a witness. Burkland admitted that he knew T.R. had a criminal history, but he did not view the underlying records before interviewing T.R. or before trial. He stated that, had he reviewed T.R.'s criminal history, he would have been able to question her about her prior use of crack cocaine. Burkland said this was not a strategic decision.

Burkland also stated he was unaware that T.R. was represented by an attorney and had initiated a civil action against the State and City. Burkland admitted he "could have asked [T.R.] in her interview if she was thinking of filing

9

any civil damages lawsuit," and he "regret[ted] not doing that." Burkland noted it was not a strategic decision to not ask T.R. about a civil lawsuit.

Burkland articulated Qerimi and Kays were e-mailing throughout Lay's trial. He believed Kays's involvement was limited to inquiring about the attachments to the motion to dismiss that he had filed.

Finally, Burkland stated that, had he known T.R. made inconsistent statements to Harless, he "would have subpoenaed Harless for trial [him]self." Despite not subpoenaing Harless, Burkland contends he was "diligent in attempting to discover what Harless had to say" because he requested an interview with Harless, but the State "mediated access to [Harless]," so he was not able to interview her.

ANALYSIS

Personal Restraint Petition

This court will grant appropriate relief to a petitioner who is under restraint and the restraint is unlawful. RAP 16.4(a). Restraint is unlawful when a conviction is obtained in violation of the Constitution of the United States or the Constitution and laws of the State of Washington, or when there are newly discovered material facts, "which in the interest of justice require vacation of the conviction." RAP 16.4(c)(2), (3). "Petitioners bear the burden of proving unlawful restraint by a preponderance of evidence." *In re Pers. Restraint of Williams*, 198 Wn.2d 342, 353, 496 P.3d 289 (2021).

Relief available through a personal restraint petition (PRP) is limited because collateral relief "undermines the principles of finality of litigation,

degrades the prominence of trial, and sometimes deprives society of the right to punish admitted offenders." *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 670, 101 P.3d 1 (2004). To obtain relief through a PRP, a petitioner must show either (1) a constitutional error from which they have suffered actual and substantial justice, or (2) a non-constitutional error creating a fundamental defect that resulted in a complete miscarriage of justice. *Davis*, 152 Wn.2d at 671-72. The petition must state "the facts upon which the claim of unlawful restraint of petitioner is based and the evidence available to support the factual allegations." RAP 16.7(2). Bald assertions and conclusory statements are not sufficient. *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992).

<u>Statement of Additional Authorities</u>

Before oral argument, Lay moved for the court to consider a statement of additional authorities. The State moved to strike the statement of additional authorities, claiming the filing was overlength, it included cases that had already been cited, and it was essentially a supplemental brief. Lay subsequently moved for the court to file an amended, overlength statement of additional authorities.

Under RAP 10.8, a party may file a statement of additional authorities. The supplementary authorities "must relate to a point made in the briefing or at oral argument" and the statement must explain "the reasons for the additional authorities." The document must be under 350 words unless the court grants permission for an overlength document. RAP 18.17(c).

Lay's amended statement of additional authorities adheres to the requirements of RAP 10.8. While the cases Lay cites are merely persuasive and

11

do not provide any novel points of law, our Supreme Court has recently clarified that, "generally, the interests of justice will be promoted by considering every relevant case, even if it is brought to our attention later than would be ideal." *State v. Luna*, 5 Wn. 3d 465, 514 n.18, 578 P.3d 273 (2025). Accordingly, we consider Lay's statement of additional authorities.

Ineffective Assistance of Counsel

Lay contends his counsel was ineffective for failing to impeach T.R. and failing to discover T.R.'s civil lawsuit. The State does not contest that Lay's counsel performed deficiently, but contends Lay was not prejudiced. We conclude Lay's counsel was deficient and, as a result, Lay was prejudiced.

We review claims of ineffective assistance of counsel de novo. *State v. Wafford*, 199 Wn. App. 32, 41, 397 P.3d 926 (2017). Whether counsel performed deficiently is determined "based upon the entire record below." *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). When an ineffective assistance of counsel claim is brought in a PRP, we may consider evidence or facts not in the existing trial record. *McFarland*, 127 Wn.2d at 335.

Both the United States Constitution and Washington State Constitution guarantee the right to effective assistance of counsel. U.S. CONST. AMEND. VI; WASH. CONST. ART. I, § 22. To establish a claim of ineffective assistance of counsel, the defendant must demonstrate that " '(1) defense counsel's representation was deficient, *i.e.*, it fell below an objective standard of reasonableness based on consideration of all the circumstances; and (2) defense counsel's deficient representation prejudiced the defendant, *i.e.*, there is a

reasonable probability that, except for counsel's unprofessional errors, the result of the proceeding would have been different.' " *State v. Vazquez*, 198 Wn.2d 239, 248-49, 494 P.3d 424 (2021) (quoting *McFarland*, 127 Wn.2d at 334-35).

Regarding the first prong of the analysis, courts maintain a strong presumption that counsel's representation was effective. *McFarland*, 127 Wn.2d at 335. But this presumption can be rebutted "where there is no conceivable legitimate tactic explaining counsel's performance." *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004). Effective representation includes investigating the client's case. *State v. Jones*, 183 Wn.2d 327, 339, 352 P.3d 776 (2015). Investigating a case may entail conducting witness interviews, *Jones*, 183 Wn.2d at 339, or researching prior convictions, *State v. Crawford*, 159 Wn.2d 86, 98-99, 147 P.3d 1288 (2006).

As to the second prong, " '[a] reasonable probability is a probability sufficient to undermine confidence in the outcome.' " *Vazquez*, 198 Wn.2d at 248 (quoting *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). A reasonable probability is lower than a preponderance of the evidence standard, and it is a "probability sufficient to undermine confidence in the outcome." *State v. Estes*, 188 Wn.2d 450, 458, 395 P.3d 1045 (2017). When a case involves a "credibility contest" between witnesses, and defense counsel fails to elicit testimony that would have diminished the credibility of a witness, a reasonable probability exists that the outcome of the case was affected. *See Jones*, 183 Wn.2d at 344.

Here, Lay's counsel admits in his declaration that his decision not to investigate T.R.'s criminal history was not a strategic decision. Lay's counsel also admits his investigation was deficient for failing to discover T.R. was involved in a civil lawsuit. The State does not challenge Lay's counsel's declaration admitting deficiency but contends Lay cannot establish prejudice because none of the information, if discovered, would have affected the outcome of the trial.

1. Previous Convictions

The State contends information about T.R.'s criminal history and prior drug use was not material to the case and, therefore, Lay was not prejudiced. However, "[e]vidence can be material even if it 'goes only to the credibility of the witness.' " *Glossip v. Oklahoma*, 604 U.S. 226, 248, 145 S. Ct. 612, 221 L. Ed. 2d 90 (2025) (quoting *Napue v. Illinois*, 360 U.S. 264, 269, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959)).

A review of T.R.'s convictions would have shown that T.R. was lying on the stand when she said she was introduced to crack cocaine at Angeline's shortly before the rape, and Lay could have used this evidence to impeach T.R.[5] Lay's defense was that T.R. traded sex for crack cocaine. T.R.'s criminal history included admissions of "a significant crack cocaine problem" and a certificate of probable cause stating, "[T.R.] admitted to having pawned numerous items of

---

[5] Under ER 609, evidence of prior convictions may be admitted in limited circumstances to impeach a witness. "Prior convictions involving dishonesty or false statements, which bear directly on the witness's veracity, are per se admissible." *State v. Millante*, 80 Wn. App. 237, 244, 908 P.2d 374 (1995).

stolen jewelry to pay for her drug debt." This information would have gone directly to T.R.'s credibility, which, in its closing arguments, the State emphasized was central to its case:

> Here is the most important thing that will have come out of my mouth to you in this trial. The law does not require corroboration. [T.R.'s] word alone is enough. If you find her credible, if you find her convincing, if you're satisfied beyond a reasonable doubt that she is telling you the truth, you can rely on her statement alone. Her word matters to find him guilty.

Had Lay's counsel used this information to impeach T.R. during cross examination, her credibility would have suffered, and because of the significance of witness credibility in this case, there is a reasonable probability it would have affected the outcome. Accordingly, Lay was prejudiced by his counsel's failure to investigate T.R.'s criminal history and prior drug use.

### 2. Civil Lawsuit

While the State admits evidence of a pending lawsuit is proper subject for impeachment, it maintains Lay cannot show that his counsel's failure to uncover T.R.'s civil lawsuit would have affected the outcome of the trial.

Whether a victim in a criminal case intends "to commence a civil action for money damages is a proper subject for impeachment." *State v. Whyde*, 30 Wn. App. 162, 166, 632 P.2d 913 (1981). A pending or commenced civil lawsuit by a victim may "bear[] on the question whether the victim would profit by a conviction in the criminal case." *State v. Guizzotti*, 60 Wn. App. 289, 293, 803 P.2d 808 (1991) (citing *State v. Boesseau*, 168 Wash. 669, 13 P.2d 53 (1932)).

T.R.'s credibility was material to the facts of the case and information concerning a civil action could have been used to impeach T.R. Because the case involved a "credibility contest" between T.R. and Lay, there is a reasonable probability that information of a civil lawsuit would have affected T.R.'s motive, credibility, and, subsequently, the result of this case.

As a result of Burkland's deficient performance, Lay was prejudiced and, accordingly, his petition should be granted.

<u>Additional Claims</u>

Lay also raises claims of a *Napue* violation, a *Brady*[6] violation, newly discovered evidence, and cumulative error. Because we grant Lay's petition under ineffective assistance of counsel, we need not address these issues.

We grant Lay's personal restraint petition, reverse his conviction, and remand for a new trial.

_____
 Smith, J.

WE CONCUR:

_____    _____
 Coburn, J.                 Mann, J.

---

⁶ *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L.Ed.2d 215 (1963).

16